**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

MICHAEL SUSSMAN,

                **Plaintiff,**

    v.

INVESCO LTD.,

                **Defendant.**

-------------------------------------------------------x

**CASE NO.: 1:25-CV-4010**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Michael Sussman, by his attorneys, Giskan Solotaroff & Anderson LLP and Ritz Clark & Ben-Asher LLP, for his Complaint against Defendant Invesco Ltd., alleges as follows:

## NATURE OF THE ACTION

1. Michael Sussman brings this action against his former employer, Invesco Ltd. ("Invesco" or "the Company"), for age discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* (the "ADEA"); the New York State Human Rights Law, N.Y. Exec. Law § 270, *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107, *et seq.* ("NYCHRL").

2. Mr. Sussman is a 61-year-old financial services professional who built a long and stable career working for Invesco and its predecessor company, OppenheimerFunds, Inc.

3. For years, Mr. Sussman was a top performer within Invesco's Wealth Management Platform. During a party to celebrate his 25th anniversary with the Company, senior leaders lauded Mr. Sussman's contributions and passion, calling him a "pioneer" and a "founder" of one of the Company's key business channels.

4. In June 2023, just 13 months after Invesco celebrated Mr. Sussman's 25th work anniversary, Invesco hired a significantly younger person with much less experience, Jennifer

Wellins. Invesco did this despite the fact that it had recently announced a hiring freeze. To Mr. Sussman's knowledge, Invesco did not post a job opening internally or externally.

5.      Three months later, in September 2023, Invesco fired Mr. Sussman. No performance issues were noted and no particular reason was given for the termination. Although Invesco claimed that Mr. Sussman's role was being eliminated as part of a reduction in force ("RIF"), that explanation cannot withstand scrutiny, as Ms. Wellins took over Mr. Sussman's accounts and replaced him.

6.      Mr. Sussman was the oldest person among his cohort in the Wealth Management Platform. The second oldest person in the cohort was also fired in September 2023 as part of the RIF and replaced with a considerably younger worker.

7.      Mr. Sussman would not have been fired if he were younger.

8.      Defendant intentionally discriminated against Mr. Sussman because of his age and replaced him with a less qualified, significantly younger employee.

9.      Defendant maintains a pattern of terminating older employees such as Mr. Sussman and replacing them with younger employees.

## JURISDICTION AND VENUE

10.      This Court has original jurisdiction under 29 U.S.C. § 633a because the case is brought under the ADEA.

11.      This Court has supplemental jurisdiction over the NYSHRL and NYCHRL claims pursuant to 28 U.S. Code § 1367(a) as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.     On February 9, 2024, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against Defendant for discrimination based on age.

13.     Plaintiff received a Notice of Right to Sue ("NORTS") from the EEOC on February 20, 2025.  This lawsuit is being filed within 90 days of receipt of the NORTS, as required under 29 U.S.C. § 626(e).

14.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein took place in this District.

## PARTIES

15.     Defendant Invesco Ltd., an investment management firm with offices around the world, is a foreign corporation with headquarters in Atlanta, Georgia.  Invesco conducts business in New York and maintains a corporate office in Lower Manhattan.

16.     Plaintiff Michael Sussman is a 61-year-old man who is domiciled in New York. He worked for Invesco and its predecessor company, OppenheimerFunds, Inc. for more than 25 years, in New York.

## FACTS

**A.  Mr. Sussman's Background and Accomplished Career in Financial Services.**

17.     Mr. Sussman is a seasoned financial services professional with more than three decades of experience working with the largest custodial firms—such as Charles Schwab, Fidelity, TD Ameritrade, and Pershing—to raise assets in mutual funds, exchange traded funds ("ETFs"), separately managed accounts ("SMAs"), and private market products.

18.     Mr. Sussman is a Certified Financial Planner who holds FINRA Series 7 and 63 licenses.  He received his M.B.A. from Adelphi University and his B.A. from SUNY Oswego.

19.    Mr. Sussman was employed by Invesco and its predecessor, OppenheimerFunds, Inc. ("Oppenheimer"), from 1997 to 2023.  For the duration of his employment, Mr. Sussman was based out of the Company's New York City office.

20.    For more than 25 years, Mr. Sussman successfully sold Oppenheimer and Invesco products to Registered Investment Advisors ("RIAs") nationwide.  He helped spearhead the RIA Channel's growth, successfully taking on a wide variety of critical responsibilities, ranging from sales to key account management.

21.    For years, Mr. Sussman also served as the head of Oppenheimer's RIA Channel. During Mr. Sussman's tenure at both Oppenheimer and Invesco, and due to his efforts, the RIA Channel grew dramatically—from only two employees at its founding at Oppenheimer in 1999 to, in its present form, approximately 20 employees at Invesco.

22.    In 2019, when Invesco acquired Oppenheimer, Mr. Sussman's role in the RIA Channel continued.  He was given the title Senior Strategic Accounts Manager ("SSAM") within Invesco's Wealth Management Platform ("WMP") and managed four major accounts: Charles Schwab, Fidelity, TD Ameritrade (later acquired by Charles Schwab), and Pershing.

23.    At Invesco, Mr. Sussman began reporting to Jay Fortuna, who is approximately three years younger.

24.    In addition to the RIA Channel, Mr. Sussman also ran two other very successful channels, the Bank Trust Channel and the Personal Investing Platforms Channel, which allow distribution of the Company's products to retail investors, a capability that was extremely limited before Mr. Sussman's efforts.

25.    In 2020, Invesco inexplicably gave one of Mr. Sussman's major accounts, Fidelity, to a colleague, Dan Lee, even though Mr. Sussman had handled the Fidelity account

with great success for many years.  Mr. Lee is approximately 20 years younger than Mr. Sussman.

26.     The decision to take Fidelity away from Mr. Sussman was made by Clint Harris, Head of WMP at Invesco.  Mr. Harris did not provide an explanation for his decision.

27.     Even after Fidelity was taken away from Mr. Sussman, his account load, measured by assets under management, was greater than that of any of his SSAM counterparts. On information and belief, Mr. Sussman was always in the top quartile of all SSAMs in terms of revenue.  The relationship with Charles Schwab alone involved $100 billion dollars in assets across a diverse range of platforms.

28.     In a reorganization in 2021, Mr. Fortuna (Mr. Sussman's manager), was demoted and stripped of his managerial responsibilities.  Mr. Sussman began reporting to Phil Ciulla, who is younger than Mr. Fortuna—and, of course, younger than Mr. Sussman.

29.     Mr. Sussman's sales numbers continued to be strong, especially in the area of ETFs, which Invesco vocally stated was one of its top priorities.

30.     Mr. Sussman was considerably older (by approximately nine or more years) than any of his counterpart SSAMs and Senior Accounts Managers ("SAMs") within the WMP, with the exception of Mr. Fortuna, who is only approximately three years younger than Mr. Sussman.

31.     In 2022, Mr. Sussman was the first in his group to onboard and gather assets for a new product called Invesco Real Estate Income Trust Inc. ("INREIT"), which Invesco had designated as a strategic imperative for the firm.

32.     While Invesco did not have a formal performance rating system, the narratives that management contributed to Mr. Sussman's annual performance reviews were consistently positive, with no negative comments.

**B.  Invesco Celebrates Mr. Sussman on his 25th Anniversary with the Company While Also Making Thinly Veiled Negative Comments About his Age.**

33.     On May 10, 2022, Invesco held an event to celebrate the 25th work anniversaries of Mr. Sussman and another colleague in the WMP, Donna Wilson.

34.     During the event, Mr. Sussman and Ms. Wilson received glowing praise from several members of Invesco's senior leadership team, including: Phil Ciulla, Head of Strategic Accounts, Independents and RIA; Clint Harris, Head of WMP; John McDonough, Head of Americas Distribution; and Martin Flanagan, Invesco's then-CEO.  With the exception of Mr. Flanagan, all of these senior leaders are at least several years younger than Mr. Sussman.

35.     At that time, Mr. Ciulla was Mr. Sussman's direct manager.  He led a team of approximately eight SSAMs and reported to Mr. Harris, who in turn reported to Mr. McDonough.

36.     In his toast, Mr. McDonough described Mr. Sussman as an "incredible contributor" responsible for a "significant part of our business."  Mr. McDonough specifically praised Mr. Sussman's achievements related to the growth of the RIA Channel.

37.     Mr. Ciulla went one step further, calling Mr. Sussman a "founder of the firm" with regard to the RIA Channel.

38.     Mr. Flanagan, in written remarks that Mr. Harris publicly read aloud during the event, stated:

> Congratulations on 25 years at Invesco.  Your dedication, commitment, and leadership played a huge role in our success.  Your passion for the business and our clients come through in everything you do.  It's always great to pause at milestones like this and reflect on the impact you've had.  Thank you for your fantastic contributions.

39.    These senior leaders all lauded Mr. Sussman's passion for his work, his pioneering spirit, and his many contributions to the Company.

40.    However, Mr. Ciulla's praise was also tinged with references to Mr. Sussman's age.  For example, Mr. Ciulla stated that he "would [like to] raise a toast for another twenty-five years, *if he has it in him*."  Everyone in attendance laughed loudly at Mr. Ciulla's remark.

41.    Mr. Sussman was deeply embarrassed to hear his boss make a very obvious and public reference to Mr. Sussman's older age.  Mr. Sussman was particularly humiliated that Mr. Ciulla had drawn attention to his age in front of his wife and children, who were also present at the event.

## C.  Despite Cost-Cutting Initiatives and a Hiring Freeze, Invesco Hires Someone Much Younger than Mr. Sussman to Perform the Same Role.

42.    In mid-2020, Invesco announced a multi-year cost-cutting initiative that included the consolidation and elimination of positions, and Company-wide restrictions on hiring non-essential positions.

43.    In early 2023, the Company announced new cost-cutting measures, including curbing non-essential travel, off-site meetings, and consulting contracts, eliminating and consolidating positions, as well as continued restrictions on non-essential hiring.  Budgets were reduced and expenses more closely scrutinized.

44.    In April 2023, during a call with analysts to discuss Invesco's first-quarter results, Invesco Chief Financial Officer Allison Dukes stated: "We're very focused on making the . . . organization simpler and more streamlined so that as we gain scale, we can generate additional operating leverage and really starting to get ourselves organized in a way that we do not have to grow expenses too much as markets improve."

45. In this atmosphere of restricted new hires and position elimination, Mr. Sussman found it strange when, in June 2023, the firm announced that a new employee, Jennifer Wellins, had been hired and would be joining the Wealth Management Platform.

46. Ms. Wellins was approximately 48 years old at the time. She is twelve years younger than Mr. Sussman. On information and belief, Ms. Wellins had recently been involuntarily terminated from Nuveen, a competitor of Invesco.

47. When Ms. Wellins was hired, Phil Ciulla informed the WMP team that she was being hired into a newly created position: Senior Strategic Account Manager covering RIA Aggregators.

48. To Mr. Sussman's knowledge, Invesco never posted an opening for this new position. Mr. Sussman was certainly never given the opportunity to apply for the role.

49. Until Ms. Wellins's hire, Mr. Sussman and his fellow SSAMs had been covering individual RIA Aggregators. There had never before been one person exclusively assigned to RIA Aggregators.

50. The creation of a brand-new position for Ms. Wellins contradicted Invesco's recent announcements concerning cost-cutting, hiring restrictions, and making the Company "simpler and more streamlined."

51. Moreover, the RIA Aggregators constituted a relatively small percentage of WMP's clients, and Mr. Sussman's cohort of SSAMs had always been perfectly able to handle them. Indeed, Mr. Sussman, as the publicly acknowledged "founder" of the RIA Channel, was adept at managing these clients.

52.     Had the role been posted publicly, Mr. Sussman certainly would have applied.  As someone who had been lauded for his leadership in the RIA Channel, Mr. Sussman was highly qualified for the position.

53.     The hiring of Ms. Wellins into this newly created, seemingly unnecessary and duplicative position was contrary both to Invesco's stated concerns about cost cutting, and to its usual practice of posting job openings.

54.     The "simpler and more streamlined" path would have been to post and fill the role internally with a well-qualified employee such as Mr. Sussman.

55.     Ms. Wellins's performance during her first several weeks with Invesco appeared to be adequate, but was certainly not noteworthy.  In fact, Invesco admits that Ms. Wellins's responsibilities shifted shortly after she was hired, suggesting that either (1) she did not fit the role she was hired to perform, or (2) this newly created SSAM covering RIA Aggregators role was not truly essential.  To Mr. Sussman's knowledge, Ms. Wellins did not garner any awards or specific achievements.

**D.  Three Months After Ms. Wellins's Hire, Mr. Sussman is Abruptly Terminated.**

56.     In September 2023, less than three months after Ms. Wellins joined Invesco and 16 months after Invesco held a party to celebrate Mr. Sussman's 25th anniversary, Mr. Sussman was suddenly informed that he was being terminated, allegedly because his position was being eliminated.

57.     However, Mr. Sussman's position was not actually eliminated; Ms. Wellins took over his former role, *selling the exact same products to the exact same clients*.

58.     Within days of Mr. Sussman's departure, Ms. Wellins took over his major accounts.  The fact that Ms. Wellins had the capacity to take over Mr. Sussman's accounts in

addition to the RIA Aggregator role is evidence that the position she was hired into was not even a full-time job—and was clearly not "essential." Moreover, Mr. Sussman would have been fully capable of handling the RIA Aggregators in addition to his regular clients, had he been given the opportunity to do so.

59.    As of late 2023, there was barely any difference between Mr. Sussman's former role and the role Ms. Wellins was serving.

60.    To the extent that Ms. Wellins may have been assigned to clients not previously assigned to Mr. Sussman, Mr. Sussman's record of success and his deep experience would have made him perfectly capable of successfully managing any such clients.

61.    Mr. Sussman, a 30-year financial services veteran with excellent client relationships and results, was better qualified for the position than Ms. Wellins for many reasons, including but not limited to the following:

- First, he had a quarter-century's deep knowledge of the products Invesco sold.

- Second, he had a demonstrated record of success at Invesco and its predecessor. His overall sales figures were strong, especially with regard to the RIA Channel. The revenue he generated was consistently in the top quartile of all SSAMs.

- Third, Mr. Sussman was excellent at developing new business. In fact, right up until the time of his abrupt termination, Mr. Sussman continued to add new products to investment models and recommended lists of his accounts, and was a group leader in onboarding the strategically important INREIT product.

62.    In terminating Mr. Sussman, Invesco did not cite any complaints about his performance or potential.

63.    Mr. Sussman indisputably built a 26-year record of success and accomplishments at Invesco, as explained in detail above.

64.    Mr. Sussman was well liked throughout Invesco.

65.    Mr. Sussman's expertise and experience were respected at Invesco.

66.    Mr. Sussman got along well with his colleagues at Invesco.

67.    In terminating Mr. Sussman, on information and belief, Invesco leadership never spoke with Jay Fortuna, who served as Mr. Sussman's direct manager for years.  On information and belief, had anyone asked Mr. Fortuna, he would have informed them that Mr. Sussman was a top performer and that the impact of his loss would be significant on WMP.

68.    Invesco has never stated that Mr. Sussman's termination was part of cost-cutting measures other than general references to a RIF and "position elimination."

69.    Invesco has never provided any legitimate business reason for Mr. Sussman's termination other than general reference to a RIF and "position elimination."

70.    In fact, Mr. Sussman's position was not eliminated; he was replaced by Ms. Wellins.

**E.  Invesco Has Engaged in a Sustained Pattern of Age Discrimination.**

71.    Invesco's disclosures in connection with Mr. Sussman's termination reveal a pattern of age discrimination.

72.    Out of 58 employees in the WMP, only three were selected for termination as part of the RIF: Mr. Sussman (age 60 at the time), Jay Fortuna (age 57 at the time), and Rob Dunphy (age 48 at the time).

73.     All three terminated individuals held the role of SSAM.

74.     All three terminated individuals were over the age of 45.  Two of them—Messrs. Sussman and Fortuna—were over age 55.

75.     Prior to the September 2023 terminations, there were 12 SSAMs.

76.     Mr. Sussman was the oldest of the 12 SSAMs.  The next oldest was Mr. Fortuna.

77.     Invesco's RIF was thus strategically targeted at older workers only.  The Company fired the two oldest SSAMs and another SSAM who was over age 45, leaving a team of nine SSAMs, all of whom—including Ms. Wellins—are a decade or more younger than Mr. Sussman.

78.     Upon information and belief, the September 2023 RIF was not the first time that Invesco terminated older employees and replaced them with significantly younger employees.

79.     In the past several years, Invesco has steadily fired employees who are over age 55 and has replaced them with workers who are at least 10 years younger.  For example, in recent years Invesco has terminated the following people, all of whom are over age 55 and were part of WMP, and has replaced them with significantly younger workers:

- Jay Fortuna, former SSAM;

- Don Vessels, former Senior Director, Strategic Accounts;

- Catherine Crandall, former Senior Account Executive;

- Tom Degnan, former Senior Account Executive;

- Ken Brodsky, former Head of WMP Operations;

- Gary Demoss, former Managing Director, Consultant Development and Delivery; and

- Donna Wilson, former Head of Investment Due Diligence.

80.     It is noteworthy that Ms. Wilson was the other employee whose 25th work anniversary was celebrated on May 10, 2022.

81.     Invesco has engaged in discriminatory terminations outside of WMP as well.  The following individuals, all of whom are over age 45, have been terminated in recent years:

- Chris Doran, former Eastern Divisional Sales Director;

- Michael Gottesman, former Central Divisional Sales Director;

- Leslie Bednar, former Head of North America Retail Platform Marketing; and

- Cate Sanders, former Director, Head of Retirement Marketing.

82.     Invesco's pattern of terminations and replacements reveals that it maintains a non-public policy of involuntarily terminating older employees and replacing them with younger workers.

83.     Invesco's attitude toward older employees is also readily apparent in its 2022 Corporate Responsibility Report, which highlights its commitment to diverse employees, including women, LGBTQ+ employees, people of color, and working parents, but never once mentions or highlights its commitment to older employees.

84.     Mr. Sussman would not have been terminated and replaced by Ms. Wellins had he been younger.

85.     As a result of Mr. Sussman's termination, he has suffered economic damages, including the forfeiture of substantial amounts of unvested long-term compensation.

86.     Mr. Sussman has suffered severe humiliation by being targeted based on his age and terminated.

87.     Mr. Sussman has suffered extreme emotional distress and anxiety about his professional future.

88.     His reputation has been severely damaged and his earnings capability threatened and disrupted by Invesco's conduct.

## FIRST CLAIM FOR RELIEF
### 29 U.S.C. § 631, *et seq.* – Age Discrimination (ADEA)

89.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

90.     Defendant intentionally and willfully discriminated against Plaintiff in the terms and conditions of his employment and terminated him because of his age, in violation of the ADEA.

91.     Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

92.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including but not limited to past and future salary, bonuses, and equity opportunities.

93.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, lasting embarrassment, and humiliation.

94.     As a result of Defendant's unlawful conduct, Plaintiff has suffered damages.

**SECOND CLAIM FOR RELIEF**
**N.Y. Exec. L. § 290.** *et seq.* **– Age Discrimination (NYSHRL)**

95.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

96.     Defendant intentionally and willfully terminated Plaintiff and discriminated against him in the terms and conditions of his employment because of his age in violation of the NYSHRL.

97.     Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

98.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including but not limited to, past and future salary, bonuses, and equity opportunities.

99.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, lasting embarrassment, and humiliation.

**THIRD CLAIM FOR RELIEF**
**N.Y.C. Admin. Code § 8-107,** *et seq.* **– Age Discrimination (NYCHRL)**

100.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

101.     Defendant intentionally and willfully terminated Plaintiff and discriminated against him in the terms and conditions of his employment because of his age in violation of the NYCHRL.

102.        Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

103.        As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including but not limited to past and future salary, bonuses, and equity opportunities.

104.        As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, lasting embarrassment, and humiliation.

### DEMAND FOR JURY TRIAL

105.        Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(A)    Damages for economic loss, including but not limited to, full compensation for all past, present and future lost wages and benefits

(B)    Front pay (as an alternative to reinstatement);

(C)    Compensatory damages for emotional distress, pain and suffering

(D)    Liquidated damages;

(E)    Punitive damages;

(F)    Pre/post judgment interest;

(G)    Reasonable attorneys' fees and costs and disbursements of this action; and

(H)    For such other and further relief as the Court may deem just and equitable.

Dated: May 13, 2025
        New York, NY

**GISKAN, SOLOTAROFF & ANDERSON LLP**

By:    Amy E. Robinson
       One Rockefeller Plaza, 8th Fl.
       New York, New York 10020
       646-964-9609
       arobinson@gslawny.com


       -and-


**RITZ CLARK & BEN-ASHER LLP**

By:    Miriam F. Clark
       One Liberty Plaza
       165 Broadway, 23rd floor
       New York, NY 10006-1404
       (212) 321-7075
       mclark@rcbalaw.com

       *ATTORNEYS FOR PLAINTIFF*